IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 4:04CR88 |
| | § | |
| AMER STANLEY (1) | § | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR REDUCTION IN SENTENCE
<u>BASED ON COVID-19 CONDITIONS</u>**

Amer Stanley has filed a motion seeking compassionate release based on COVID-19 concerns. The government urges the Court to deny compassionate release because Stanley does not show extraordinary or compelling reasons to justify release. To the extent Stanley seeks a sentence reduction and release to home confinement, the Court lacks authority to grant relief.

**Procedural History**

In 2004, law enforcement obtained information that Stanley was the source of supply for large quantities of controlled substances, including cocaine and methamphetamine. PSR ¶ 7. During the investigation, a confidential source (CS) purchased cocaine and methamphetamine from Stanley's coconspirator on several occasions. PSR ¶¶ 7-9. In May 2004, a search warrant was executed at Stanley's residence. PSR ¶ 10. During a search of the residence, officers located marijuana, methamphetamine, heroin, $66,200, 21 firearms and a silencer. PSR ¶ 10. Three storage facilities that Stanley rented were also searched, and three additional firearms were located. PSR ¶ 10.

**Response to Motion for Compassionate Release—Page 1**

Three of the recovered firearms were determined to meet the definition of a machinegun as defined in 26 U.S.C. § 5845(b). PSR ¶ 11. Two of the machineguns had obliterated serial numbers. PSR ¶ 11. Neither the machineguns, nor the silencer were registered to Stanley. PSR ¶ 11.

Stanley was charged in an eight count indictment: Count 1--conspiracy to possess with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 846; Count 2--possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841; Counts 3 and 4--possession of a machinegun in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); Count 5--possession of a machinegun, in violation of 18 U.S.C. § 922(o); Count 6--possession of an unregistered silencer, in violation of 26 U.S.C. § 5861(d); Count 7--possession of machineguns with obliterated serial numbers, in violation of 26 U.S.C. § 5861(h); and Count 8--possession of a firearm not identified by a serial number, in violation of 26 U.S.C. § 5861(i). PSR ¶ 3.

Stanley entered a favorable plea agreement under Fed. R. Crim. P. 11(c)(1)(C), which allowed him to plead guilty to a 40 year term of imprisonment, comprising of 10 years for Count 2 and 30 years for Count 3 to run consecutively to Count 2. PSR ¶ 5. On August 10, 2006, the Court (Brown, J.) sentenced Stanley to 480 months' imprisonment in accordance with the plea agreement. ECF Doc. 90.

Stanley is serving his sentence at FCI Yazoo City in Yazoo City, Mississippi. BOP currently projects Stanley's release date to be April 10, 2030, although projected release dates are subject to change.

According to his mother, during the past two years, Stanley has experienced "chronic pain, difficulty breathing & swallowing, neck and shoulder pain, limited mobility, slurring of speech, numbness & tingling from his face to his feet." Although Stanley's mother admits that she doesn't "have any real information about [her] son's diagnosis", she claims that MS or ALS are possible diagnoses.

A review of Stanley's medical records show Stanley had previously reported, chronic neck pain that was exacerbated by lateral movements, and generalized weakness and numbness to multiple areas of his body. Stanley's latest complaints were in November 2019. Stanley was prescribed Naproxen and was counseled about diet, exercise, and medication use. Stanley was ordered to follow up at the Chronic Care Clinic as needed.

An MRI of both Stanley's brain and cervical spine were performed, and the results, dated December 20, 2019, showed a normal study. The MRI for the cervical spine noted minor degenerative disc disease.

On May 19, 2020, Stanley filed a motion asking that his sentence be reduced and that he be placed on home confinement under compassionate release due to the coronavirus pandemic. ECF Doc. 90. Stanley asserts that he submitted a request for compassionate release to the Warden on February 2, 2020, and states there has been no response from the Bureau of Prisons. For the reasons set out below, the government opposes relief.

## Discussion

I. **BOP's Response to the COVID-19 Pandemic**

BOP recognizes that COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and has resulted in massive disruption to our society and economy. And BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus

**Response to Motion for Compassionate Release—Page 4**

(COVID-19) Action Plan, to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

On April 13, 2020, BOP implemented Phase Six of the Action Plan, which currently governs operations. The modified operations plan requires that only limited group gathering be afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly-admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a

medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff. BOP is sharing the Action Plan with facilities providing halfway-house confinement.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Additionally, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use

**Response to Motion for Compassionate Release—Page 6**

of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. See https://dojnet.doj.gov/usao/eousa/ole/tables/misc/agcovid2.pdf. As of May 31, 2020, BOP has transferred an additional 3,544 inmates to home confinement in accordance with the Attorney General's memorandum. *See* https://www.bop.gov/coronavirus/.

Taken together, these measures mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately, some inmates have become ill, and more likely will in the weeks

**Response to Motion for Compassionate Release—Page 7**

ahead.  But BOP must balance its concern for the health of its inmates and staff alongside other critical considerations.  For example, notwithstanding the current pandemic, BOP must carry out its charge to incarcerate sentenced criminals to protect the public.  It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry.  It must marshal its resources to care for inmates in the most efficient and beneficial manner possible.  It must assess release plans, which are essential to ensure that an inmate has a safe place to live and access to health care in these difficult times.  And it must consider other factors, including the availability of transportation for inmates (at a time that interstate transportation services often used by released inmates have reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

BOP is managing COVID-19 at FCI Yazoo City Low.  As of the May 31, 2020, FCI Yazoo City Low has 16 open COVID-19 cases among inmates and six open staff cases.  https://www.bop.gov/coronavirus/ .  Eighty-nine inmates and two staff members have recovered from the virus.  *Id.*  There have been no deaths at the facility.

## II.     Legal Framework for Compassionate Release

Under 18 U.S.C. § 3582(c)(1)(A), district courts may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment.  Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf.  18 U.S.C. § 3582(c)(1)(A).  A court may grant a defendant's motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a

**Response to Motion for Compassionate Release—Page 8**

motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If the exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under Section 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the Section 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.[1]

The policy statement includes an application note that specifies the types of

---

[1] The policy statement refers only to motions filed by the BOP Director because it was last amended on November 1, 2018. Until enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of Section 3582(c)(1)(A)'s command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission" and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

**Response to Motion for Compassionate Release—Page 9**

medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii).

The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. U.S.S.G. § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." U.S.S.G. § 1B1.13, cmt. n.1(D).

### III. Stanley does not qualify for compassionate release.

Stanley's request for compassionate release fails on the merits because he has not identified "extraordinary and compelling reasons" for a reduction within the meaning of Section 3582(c)(1)(A) and the Sentencing Commission's policy statement.

As set out above, under the relevant provision of Section 3582(c), a court can

grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. U.S.S.G. § 1B1.13, cmt. n.1(A). So, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include (i) any terminal illness and (ii) any "serious physical or medical condition … that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his motion must be denied. Stanley fails to meet either criteria. He does not have a terminal illness or a serious medical condition that substantially diminishes his ability to care for himself. Rather, Stanley's ailments can easily be treated with appropriate maintenance medication.

Moreover, the mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either category and, therefore, does not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere

**Response to Motion for Compassionate Release—Page 11**

existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020), *as revised* (Apr. 8, 2020); *see also United States v. Eberhart*, No. 13-cr-00313-PJH-1, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25. 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A)."). To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, it would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully-imposed sentences to deal with a world-wide viral pandemic.

This does not mean, however, that COVID-19 is irrelevant to a court's analysis of a motion under Section 3582(c)(1)(A). If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19, that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (i.e., one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care

**Response to Motion for Compassionate Release—Page 12**

within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19. U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I). But as part of its analysis of the totality of circumstances, the Court should consider whether the inmate is more likely to contract COVID-19 if he or she is released than if he or she remains incarcerated. That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his or her institution.

As noted above, Stanley's physical condition does not increase the risk that he will contract COVID-19. Stanley has not shown that he is not a danger to the safety of the community or otherwise merits release under the Section 3553(a) factors. Stanley was a distributor of large amounts of methamphetamine and cocaine. He possessed three machine guns while trafficking narcotics. Although Stanley has not committed many violations while incarcerated, he has been sanctioned for disciplinary violations, the latest in 2018 for possessing a hazardous tool. Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2). Additionally, this Court must consider the Section 3553(a) factors, as "applicable," as part of its analysis. See 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). These do not weigh in Stanley's favor.

## IV. This Court lacks authority to reduce Stanley's sentence or direct the BOP to release him to home confinement.

Stanley requests that his sentence be reduced and that he be released to home confinement. This request should be denied because, with few exceptions, the Court has no general authority to reduce an otherwise-final sentence.

"[A] final judgment commands respect." *United States v. Frady*, 456 U.S. 152, 165 (1982). After conviction and the exhaustion or waiver of all appeals, courts are "entitled to presume" that the defendant "stands fairly and finally convicted." *Id.* at 164 ("Our trial and appellate procedures are not so unreliable that we may not afford their completed operation any binding effect . . . ."). Thus, with few exceptions, "the sentencing judge's power to modify the sentence ends after it is imposed and the prisoner commences service under it." *United States v. Wright*, 744 F.2d 1127, 1131 (5th Cir. 1984) (*citing United States v. Addonizio,* 442 U.S. 178, 189 and n.16 (1979)).

Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). Following the imposition of sentence, the Court has limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (per curiam).

Finally, as noted above, a defendant may seek a reduction in his sentence for compassionate release under 18 U.S.C. § 3582(c)(1)(A)—provided the statutory prerequisites are met—or based on a retroactive amendment to the sentencing guidelines under 18 U.S.C. § 3582(c)(2). *See Dillon*, 560 U.S. at 827 (describing the procedure for a motion under Section 3582(c)(2)).

Here, Stanley's sentence is final, and his current motion does not fall within an exception.

## V.     Conclusion

The government respectfully urges the Court to deny Stanley's motion for compassionate release. The government also urges the Court to deny Stanley's motion for early release to home confinement.

Respectfully submitted,

STEPHEN J. COX
UNITED STATES ATTORNEY

*/s/ Tracey M. Batson*
Tracey M. Batson
Assistant United States Attorney
101 E. Park Blvd., Suite 500
Plano, Texas 75074
(972) 509-1201
Texas Bar No. 00784119
Tracey.Batson@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing response will be forwarded by United States Mail to Amer Stanley, Reg. No. 11417-078 at FCI Yazoo City, P.O. Box 5000, Yazoo City, Mississippi, 39194, on June 1, 2020.

*/s/ Tracey M. Batson*
Tracey M. Batson
Assistant United States Attorney
