UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| | § | |
| v. | § | No. 4:04-CR-00088(1) |
| | § | Judge Jordan |
| AMER STANLEY | § | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO
REDUCE SENTENCE UNDER 18 U.S.C. § 3582(C)(1)(A)(i)**

Defendant Amer Stanley has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A). The motion should be denied given that the defendant has been vaccinated against Covid-19 and fails to show how consideration of the factors under 18 U.S.C. § 3553(a) merits relief under the statute.

**BACKGROUND**

**A.  Stanley's criminal conduct**

In May 2004, a grand jury indicted Stanley and one codefendant in an eight-count Indictment. Stanley was charged with conspiracy to distribute or possess with intent to distribute methamphetamine, in violation of 21 U.S.C. § 846 (count one), possession of a controlled substance with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (count two), possession of a machine gun in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (counts three and four), possession of machine guns (three), in violation of 18 U.S.C. § 922(o) (count five), possession of an unregistered silencer, in violation of 26 U.S.C. § 5861(d) (count six), possession of machineguns with obliterated manufacturer's serial numbers, in violation of 26 U.S.C. § 5861(h) (count seven), and possession of a firearm not identified by a serial number, in violation of 26 U.S.C. § 6861(i) (count eight). ECF No. 72 at ¶ 3. He pleaded guilty on June 28, 2004, to

1

counts two and three pursuant to a Rule 11(c)(1)(C) plea agreement. As part of the plea agreement, Stanley stipulated to a ten-year sentence as to count two and a 30-year sentence as to count three to run consecutive to count two for a total sentence of 40 years in prison. *Id.* at ¶ 5.

Stanley was sentenced on August 6, 2006, to 40 years imprisonment and five years' supervised release. He was further ordered to pay a $200 special assessment and $10,000 fine. ECF No. 74. Stanley's sentence was subsequently reduced to 60 months as to count two and 300 months as to count three for a total of 30 years in prison. He is serving his sentence at MCFP Springfield, with an anticipated release date of April 20, 2030. The defendant has served approximately 207 months and has credit for good conduct time of approximately 66 months, for total time served of approximately 273 months.

Stanley has been disciplined six times while in BOP custody. Most recently he was sanctioned in 2019 for possession of a hazardous tool; in 2018 for possession of an unauthorized item and possession of gambling paraphernalia; and in 2017 exchanging money for contraband and conducting a gambling pool. Stanley was also sanctioned for fighting, possession of a dangerous weapon, and giving/accepting money without authorization.

**B.      Stanley's request for compassionate release**

Stanley has submitted three requests to his wardens. On June 7, 2020, he submitted a request to the warden at FCI Yazoo City requesting compassionate release claiming that he is being diagnosed with "ALS/PLS" which places him at risk of contracting pneumonia. On November 22, 2020, Stanley submitted a request to the warden at FTC Oklahoma City seeking compassionate release due to COVID-19 and his underlying neurological disorder that the BOP is trying to diagnose. The warden denied

this request. Lastly, Stanley submitted a request to the warden at MCFP Springfield on July 21, 2021, seeking compassionate release due to obesity, heart damage, and neurological disorder (possibly ALS/PLS). He further claimed that he is experiencing numbness and weakness on his left side and in his neck. Because more than 30 days have passed since Stanley's requests to the wardens, he has satisfied the administrative exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A).

On July 26 and August 16, 2021, Stanley filed his motion seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A). In his motion he claims that he suffers from obesity, heart damage, has a history of smoking and a progressive neurological disorder that is attacking the muscles in his body. ECF No. 99.

The undersigned obtained Stanley's medical records for 2020 and 2021 from BOP, which are filed under seal as Exhibit A. The records reveal that the defendant arrived at MCFP Springfield, a federal medical center, in December 2020. Stanley, who is 43 years old, presents obesity with a BMI of 33.6, polyneuropathy (the simultaneous malfunction of many peripheral nerves throughout the body), cervicalgia (neck pain), and abnormal findings of blood chemistry. Exhibit A at 65-66. The only medications that he is prescribed are acetaminophen, which was renewed on June 7, 2021, and meloxicam, which was discontinued on August 20 at Stanley's request.[1] *Id*. at 2, 9. His conditions appear well-controlled. Stanley is classified as Care Level 1 "healthy, simple chronic care." CARE LEVEL 1 are less than 70 years of age and are generally healthy. They may have limited medical needs that can be easily managed by clinician evaluations every 6–12 months. https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf. He is fully ambulatory and engages in all normal activities of daily living.

---

[1] According to WebMD, meloxicam is used to treat arthritis.

Since his arrival at MCFP Springfield, Stanley has undergone numerous tests and consults regarding his claimed medical conditions. In January 2021, a scrotal doppler revealed a testicular nodule (cyst) on the right testicle, which was otherwise normal. Exhibit A at 127. In March, Stanley saw neurologist Jennifer Zhai for leg weakness. Dr. Zhai's recommended treatment plan included repeating NCV (nerve conduction velocity)/EMG (electromyography), T spine MRI to confirm or rule out tumor, and CK (creatin kinase), TSH (thyroid-stimulating hormone) and ANA (antinuclear antibody) laboratory tests. She further recommended a muscle biopsy if Stanley's CK laboratory results were still high. *Id*. at 121. The results of the MRI of the thoracic spine were abnormal and Dr. Zhai recommended a pulmonology consult which occurred on August 17, 2021. *Id*. at 3, 27, 114-15. The results of Stanley's EMG and NCV findings were normal. *Id*. at 110. Moreover, his TSH was in normal range and his ANA result was negative. *Id*. at 95, 98. However, Stanley's CK laboratory results remained high, and he was referred to Dr. John Hornick for a muscle biopsy which will take place in November. *Id*. at 6, 92, 104-06.

Stanley has also received numerous vaccinations since the first of the year, including the vaccination against COVID-19. He received doses of the Moderna vaccine on February 25, 2021, and March 25, 2021. Exhibit A at 75

Therefore, the records show that MCFP Springfield is providing Stanley with appropriate care to manage his medical conditions.

C.  **BOP's response to the Covid-19 pandemic**

As the Court is aware, from the moment the pandemic began, the BOP made extensive changes to its operations based on a plan that was prepared over many years

and refined in early 2020 in consultation with the Centers for Disease Control (CDC) and the World Health Organization. Those efforts continue.

The government recognizes that the COVID-19 case rate at a particular BOP institution is in flux. We therefore focus primarily on considerations specific to the defendant. But BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the defendant's motion.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences.[2] This initiative, combined with

---

[2]   This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review); *see also, e.g.*, *United States v. Aguibi*, -- F. App'x --, 2021 WL 2623415, n.2 (3d Cir. June 25, 2021) (not precedential; per curiam) ("To the extent that Aguibi requested a transition to home confinement, the Bureau of Prisons has the sole authority to place a prisoner in home confinement."); *United States v. Saunders*, 986 F.3d 1076, 1078 (7th Cir. 2021); *United States v. Houck,* 2 F.4th 1082, 1085 (8th Cir. 2021); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. The total BOP population is now more that 10% less than it was at the outset of the pandemic, standing at the lowest level in decades.

When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

All of these strenuous efforts have been fruitful. It is notable that the rate of deaths in federal prisons has been comparable to that in the general U.S. population, a notable achievement given the known risks of viral spread in a congregate prison setting.[3]

Specifically, as it relates to Stanley, BOP's aggressive efforts have extended to MCFP Springfield. That institution houses 873 inmates. At present, there are zero inmates who are reported positive. A total of 338 inmates who previously tested positive have recovered. There have been 20 COVID-related deaths at this institution. The latest statistics are available at www.bop.gov/coronavirus.

### D.   The BOP is aggressively vaccinating staff and inmates

BOP worked with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure that BOP received the COVID-19 vaccines as they became available, and then offered the vaccines to all willing staff members and inmates, beginning first with staff members (who present a more likely vector for COVID-19 transmission into an institution), and

---

[3] While there have been 242 inmate deaths related to COVID-19 at BOP institutions (which at the outset of the pandemic held over 157,000 inmates), there have been over 615,000 deaths in the general population. Both figures represent tragedies, but the defendant has not shown that the toll in BOP facilities is materially worse than in the rest of the country.

then offering the vaccines to inmates in order of priority of need in accordance with CDC guidelines. As a court observed, "Since the vaccines became available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate." *United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) (footnote omitted).

As of this writing, through an intensive effort over the past months, BOP has offered a vaccine to every inmate in BOP-managed institutions. BOP has administered a total of 212,754 doses to inmates and staff. Going forward, BOP will continue to offer vaccines to newly arrived inmates, and to those inmates who initially declined a vaccine if they change their minds, as expeditiously as possible as supplies are available.

At FCFP Springfield, where the defendant is held, BOP has fully vaccinated 382 staff members, and 691 inmates (which is 79% of the current inmate population and does not account for those additional inmates who declined vaccination).

The clinical guidance provided to BOP health services professionals is available at https://www.bop.gov/resources/pdfs/COVID19_vaccine_guidance_20210311.pdf. The latest information on BOP's vaccination efforts, including the number of completed vaccinations at each institution, is available at https://www.bop.gov/coronavirus/, and is updated every weekday.

## DISCUSSION

**A.      Governing law**

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1)  in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."[4]

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

---

[4] The inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon v. United States,* 560 U.S. 817, 827-28 (2010) (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under 18 U.S.C. § 3582(c)(2)).

In application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release, as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant.—
>
>     (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>     (ii) The defendant is—
>
>         (I) suffering from a serious physical or medical condition,
>
>         (II) suffering from a serious functional or cognitive impairment, or
>
>         (III) experiencing deteriorating physical or mental health because of the aging process,
>
>     that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
>     (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
>     (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason

> other than, or in combination with, the reasons described in subdivisions (A) through (C).

But the policy statement, on its face, "only applies to 'motion[s] of the Director of the Bureau of Prisons.'" *United States v. Shkambi*, -- F.3d --, 2021 WL 1291609, at *4 (5th Cir. April 7, 2021) (quoting § 3582(c)(1)(A)). It does not address motions filed by prisoners, which the First Step Act now authorizes upon administrative exhaustion. *Id*. As of this writing, the *Guidelines Manual* does not have an "applicable" policy statement that covers prisoner-filed motions because the Sentencing Commission, which lacks a quorum, has not updated the policy statement to account for changes brought by the First Step Act. *See United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) (Easterbrook, J.).

The Fifth Circuit, in *Shkambi*, held that "neither the policy statement nor the commentary to it *binds* a district court addressing a prisoner's own motion under § 3582." *Shkambi*, 2021 WL 1291609, at *4 (emphasis supplied). Rather, a district court is "bound only by § 3582(c)(1)(A)(i) and, as always, the sentencing factors in § 3553(a)." *Id*. Section 3582(c)(1)(A)(i) provides that a court may only reduce a term of imprisonment "if it finds that[,]" as relevant here, "extraordinary and compelling reasons warrant such a reduction[.]" 18 U.S.C. § 3582(c)(1)(A)(i). Congress did not define "extraordinary and compelling reasons" in the statute but rather "delegated that authority to the Sentencing Commission." *Shkambi*, 2021 WL 1291609, at *3.[5]

Though *Shkambi* instructs that district courts are not *bound* by the description of "extraordinary and compelling reasons" delineated in the commentary to § 1B1.13 where a prisoner rather than the BOP Director files a motion for compassionate release, nothing

---

[5] Congress did, however, in 28 U.S.C. § 994(t) provide one restriction: "Rehabilitation of the defendant alone shall not be considered an extraordinary reason."

in *Shkambi* prevents district courts from being *guided* by that description. In fact, in *United States v. Thompson*, 984 F.3d 431 (5th Cir. 2021), which predates *Shkambi*, the Fifth Circuit recognized that while the commentary to U.S.S.G. § 1B1.13 is "not dispositive," it "informs our analysis as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release." *Id*. at 433 (citing *United States v. Rivas*, 833 F. App'x 556, 557-58 (5th Cir. 2020)); *see also United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020) (recognizing that the First Step Act authorizes prisoners to file motions under § 3582(c)(1)(A) yet looking to § 1B1.13's commentary to describe what constitutes an "extraordinary and compelling" reason).

Allowing district courts to be informed by and look for guidance from § 1B1.13 and the commentary, so long as courts do not feel bound by them, is consistent with decisions from other circuits upon which *Shkambi* relied. For example, in *Gunn*, the Seventh Circuit found (like *Shkambi*) that because "[s]ection 1B1.13 address motions and determinations of the [BOP] Director, not motions by prisoners", the "trailing paragraph of § 3582(c)(1)(A) does not curtail a district judge's discretion." *Id*. at 1180. Yet *Gunn* nevertheless found that "[t]he substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. In this way the Commission's analysis can guide discretion without being conclusive." *Id*.; *see also United States v. McCoy*, 981 F.3d 271, 282 & n.7 (4th Cir. 2020) (holding that "§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)" but that this "does not leave Guideline § 1B1.13 without practical import[,] . . . as . . . it remains helpful guidance even when motions are filed by defendants").

11

The absence of a binding policy statement that applies to prisoner-filed motions does not create "a sort of Wild West in court, with every district judge having an idiosyncratic release policy." *Gunn*, 980 F.3d at 1180. *Shkambi* itself recognized that "§ 3582 does not authorize a district court to modify a sentence based on caprice or unbridled discretion." *Shkambi*, 2021 WL 1291609, at *2. The "general rule," which promotes important finality interests, still applies: "court[s] may not modify a term of imprisonment once it has been imposed . . . ." *Thompson*, 984 F.3d at 433 (quoting § 3582(c)); *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion) (recognizing that finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system"). Before reducing a sentence a district court must find, among other things, "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A). Though Congress did not define those terms in the statute,"[i]n construing the United States Code [the court's] task must begin with the words provided by Congress and the plain meaning of those words." *United States v. Valencia*, 394 F.3d 352, 355 (5th Cir. 2004); *United States v. Garcia*, 86 F.3d 394, 403 (5th Cir. 1996) (cleaned up) ("It is a cardinal canon o[f] statutory construction that in interpreting a statute, the words of a statute will be given their plain meaning"). The plain meaning of "extraordinary" is "out of the usual or regular course of order." *Oxford English Dictionary* (2d ed. 1989). "Compelling' means "irresistible; demanding attention, respect." *Id*. That's a high standard.

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020). As the terminology in the statute makes clear, compassionate release is

12

"rare" and "extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019).

B.  **Covid-19 and compassionate release**

The Covid-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Fifth Circuit has held that "[f]ear of COVID doesn't automatically entitle a prisoner to release." *Thompson*, 984 F.3d at 435; *see also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread").

The government acknowledges, however, that an inmate who has not been offered a vaccine and who presents evidence showing a medical condition identified by the CDC as increasing the risk of an adverse outcome from Covid-19 and is not expected to recover from it presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility." U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I). In such case the inmate may be less able to protect himself against an unfavorable outcome from the disease. *See United States v. Tartaglione*, 2020 WL 3969778, at *5-6 (E.D. Pa. July 14, 2020) ("a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of

13

exposure to COVID-19 in the facility where the prisoner is held" (quoting *United States v. Somerville*, 463 F. Supp. 3d 585, 597 (W.D. Pa. 2020)).

The CDC's list of risk factors appears at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. It reports a list of conditions that "can make you more likely to get severely ill from COVID-19." An inmate who has not been offered a vaccine, who presents a condition on that list, presents an "extraordinary and compelling reason" allowing consideration of compassionate release, subject to consideration of the § 3553(a) factors.[6]

---

[6] Before March 29, 2021, the CDC presented two separate lists of conditions that either definitively entailed a greater risk of severe illness or "might" entail a greater risk of severe illness. Those "might" conditions were asthma (moderate-to-severe); cerebrovascular disease; cystic fibrosis; hypertension; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; overweight; pulmonary fibrosis; thalassemia; and type 1 diabetes mellitus. At that time, the government maintained – and most courts agreed – that inmates with conditions on the "might" list did not present an extraordinary basis for relief. *See, e.g.*, *United States v. Durham*, 2020 WL 5577884, at *2 (W.D.N.C. Sept. 17, 2020); *United States v. Moldover*, 2020 WL 6731111, at *9 (E.D. Pa. Nov. 13, 2020) ("District courts have routinely denied motions for compassionate release based on allegations of only potential COVID-19 risk factors, including asthma and hypertension").

In the March 29 revision, the CDC merged the two lists without extensive explanation. The CDC also presents a page with information for healthcare providers that discusses the evidentiary basis for designating each risk factor and indicates that there remains less extensive support for drawing conclusions regarding most conditions formerly listed as "might" factors. *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html. The government nevertheless continues to follow CDC guidance and thus relies on the CDC's expanded list to define what constitutes an "extraordinary and compelling" basis for consideration of compassionate release of an inmate who has not been offered a vaccine.

Although age is not listed as a separate risk factor, the CDC has emphasized that it is an important indicator of risk. The CDC page regarding risk factors, updated on March 29, 2021, states: "More than 80% of COVID-19 deaths occur in people over age 65, and more than 95% of COVID-19 deaths occur in people older than 45."

**C. Stanley has failed to present "extraordinary and compelling" reasons for relief.**

Stanley presents the risk factor of obesity. But he fails to present an "extraordinary and compelling reason" because he has been vaccinated. Therefore, Stanley's motion should be denied because he received, courtesy of the BOP, both doses of the COVID-19 Moderna vaccine. Exhibit A at 75 (first dose administered on February 25, 2021and the second on March 25, 2021); *see also United States v. Smith*, 2021 WL 364636, at *2 (E.D. Mich. Feb. 3, 2021) ("absent some shift in the scientific consensus, Defendant's vaccination against COVID-19 precludes the argument that his susceptibility to the disease is 'extraordinary and compelling' for purposes of § 3582(c)(1)(A)"); *United States v. Grummer*, 2021 WL 568782, at *2 (S.D. Cal. Feb. 16, 2021) (denying compassionate release to defendant with several chronic medical conditions when defendant had been fully vaccinated); *United States v. Wakefield*, 2021 WL 640690, at *3 (W.D.N.C. Feb. 18, 2021) (defendant presents obesity, diabetes, and hypertension, but he previously tested positive, and has received the first dose; "Because he has already contracted the virus and recovered without complication, and because he is in the process of being vaccinated, the Defendant cannot meet his burden of establishing that his COVID-19 risk is an extraordinary and compelling reason for his release."); *United States v. Lipscomb*, 2021 WL 734519, at *2 (M.D. Fla. Feb. 25, 2021) (inmate received both doses, which "demolishes Lipscomb's conclusory contention BOP is not taking adequate precautions. Currently, tens—if not hundreds—of millions of Americans are scurrying to figure out how to get a vaccine. Yet Lipscomb already received both doses. This does not suggest BOP is taking COVID-19 lightly or not protecting Lipscomb").

In any event, the Court should deny relief based on the § 3553(a) factors. *See United States v. Doe*, 833 F. App'x 366 (3d Cir. 2020) (summarily affirming the denial of compassionate release, in a case in which the defendant presented medical risk, upon

holding that the district court did not abuse its discretion in considering the nature of the offense, the defendant's history, and the status of the virus at the facility); *United States v. Bullock*, 833 F. App'x 934 (3d Cir. 2021) (granting motion for summary affirmance of denial of compassionate release, as the district court did not abuse its discretion in denying relief for medically vulnerable inmate upon considering the 3553(a) factors, including the substantial time remaining to be served on the sentence and the defendant's criminal history and institutional infractions).

Stanley continues to present a danger to the community and should be required to serve the sentence that this Court imposed for his criminal conduct. His conviction stems from information obtained by law enforcement that Stanley was the source of supply for large quantities of controlled substances, including cocaine and methamphetamine. During the investigation, a confidential source (CS) purchased cocaine and methamphetamine from Stanley's coconspirator on several occasions. A search warrant executed at Stanley's residence revealed marijuana, methamphetamine, heroin, $66,200, 21 firearms and a silencer. A search of three storage facilities that Stanley rented yielded three additional firearms. ECF No. 72 at ¶¶ 7-10. Stanley pleaded guilty pursuant to a binding Rule 11(c)(1)(C) plea agreement to possession of a controlled substance with the intent to distribute and possession of a machinegun in furtherance of a drug trafficking crime and agreed to a 40-year term of imprisonment. *Id*. at ¶ 5. The Court sentenced him accordingly. ECF NO. 74. Stanley's sentenced was later reduced to 30 years. There is no doubt that Stanley was engaged in illegal conduct that presented significant danger to the community.

Stanley fails to demonstrate how release, after 23 years into a 30-year sentence for a serious drug offense reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). All told, consideration of the 3553(a) factors, that Stanley's health conditions are being

effectively managed by the BOP and that he has received both doses of the COVID-19 Moderna vaccine, show that Stanley is not entitled to relief.

## CONCLUSION

For these reasons, this Court should deny Stanley's motion for a sentence reduction on the merits.

Respectfully submitted,

NICHOLAS J. GANJEI
Acting United States Attorney
Eastern District of Texas

/s/ *Tracey M. Batson*
Tracey M. Batson
Assistant United States Attorney
101 E Park Blvd, Suite 500
Plano, TX 75074
(972) 509-1201
Fax: (972) 509-1209
Email: tracey.batson@usdoj.gov

## **CERTIFICATE OF SERVICE**

I certify that on August 27, 2021, I electronically filed this document with the Clerk of Court using the CM/ECF system. I also certify that within 48 hours, I will mail this document by United States Postal Service or other postal carrier to the following non-CM/ECF participant:

> AMER STANLEY
> Register Number: 11417-078
> MCFP SPRINGFIELD
> P.O. BOX 4000
> SPRINGFIELD, MO 65801

/s/ *Tracey M. Batson*
Tracey M. Batson
Assistant United States Attorney
